MILLER, *Trustee, Appellant,* v. THE MUNICIPAL ELECTRIC LIGHTING & POWER COMPANY *et al.*

Division One, March 10, 1896.

1.  **Written Contract:** CONSTRUCTION.   A written contract for the erection of a boiler plant construed and *held* to call for a plant of six thousand horse power to be paid for at the rate of $18.50 a horse power, and that plaintiffs could not furnish all the power which could be economically produced upon the boilers erected in the plant, as determined by actual test.

2. ———: ———: PAROL EVIDENCE. Parol evidence was not admissible to show that it was the real intention of the parties to the contract that plaintiff should furnish all the power that the boiler plant would produce, not less than six thousand horse power, and that defendant was to pay for all such power at the rate of $18.50 a horse power.

*Appeal from St. Louis City Circuit Court.*—HON. JACOB
KLEIN, Judge.

AFFIRMED.

*Rowell & Ferriss* and *John W. Noble* for appellant.

(1) The court erred in its construction of the contract sued upon. *Ayers v. Hays*, 13 Mo. 252; *Boxley v. Stevens*, 31 Mo. 201; *Miller v. Wagenhauser*, 18 Mo. App. 11; *Hadden v. Collector, etc.*, 5 Wall. 107; *Johnson v. Wood*, 84 Mo. 508. (2) The court erred in excluding testimony as to the facts surrounding the execution of the contract, the situation and circumstances of the parties, their knowledge of certain facts bearing upon the terms of the' contract and their general object in making the contract, as well as the acts of the parties showing the construction which they placed upon it themselves. Jones, Construction of Contracts, sec. 42; *Union Depot Co. v. Railroad Co.*, 113 Mo. 225; *Mathews v. Danaby*, 26 Mo. App. 660.

*Lionberger & Shepley* for respondent.

(1) The contract between the parties having been reduced to writing, parol evidence of prior or contemporary "understandings," "purposes," "qualifications," etc., was properly excluded. *Tracy v. Iron Works*, 104 Mo. 199; *Evans v. Brass Co.*, 118 Mo. 553. (2) It was the duty of the court to construe the contract, and its construction was the only one justified by the language of the instrument. *Brawley v. U. S.*,

96 U. S. 171; *Norrington v. White,* 115 U. S. 188; 2 Benj. on Sales, 686.

BRACE, P. J.—This is an action to recover the sum of $115,392.22 alleged to be due plaintiff as trustee of the Rohan Brothers Boiler Manufacturing Company, for the erection and construction by the said boiler company of nineteen boilers on the premises of the defendant in the city of St. Louis and to enforce a mechanic's lien upon said premises for said sum.

The petition alleges that the boilers so erected had a capacity of eleven thousand, four hundred horse power, admits the receipt of $115,508.41, and asks judgment for the amount first aforesaid, as balance due for the horse power alleged to have been furnished at the rate of $18.50 per horse power.

The answer admits the furnishing by said boiler company at defendant's request of a boiler plant consisting of nineteen boilers, and the payment of the amount of money credited therefor, and avers that said boiler plant was furnished by said company pursuant to and under the following specifications and proposal, which were accepted by the power company, to wit:

"SPECIFICATIONS FOR THE ERECTION OF BOILER PLANT OF 6,000 H. P. AND ALL NECESSARY APPURTENANCES.

"BOILERS.

"Boilers to be twenty in number and to be at least 300 H. P. each, and to stand a working pressure of at least 110 lbs. to sq. in. All material to be Park Brothers 60,000 lbs. flange steel. All tubes of best standard make, and workmanship to be first-class in every particular. All bracing and stay bolts to be of best material and spaced so as to allow a hydraulic test

of 160 lbs. to sq. in. Suitable openings to be made to allow boilers to be cleaned handily. Boilers to be built and placed as architect and chief engineer may direct, and as may best suit building erected by the company.

## "FITTINGS, VALVES, ETC.

"Each boiler to have a complete set of fittings, as follows: One 2 1-2 inch check, one 2 1-2 blow-off, and one 5 inch pop safety valve, three gauge cocks, one combination water and steam gauge, one low water alarm gauge, all of the best standard make and all steam gauges to be nickel plated.

## "HEATERS, FITTERS, ETC.

"Heaters to be six in number, 'each of 1,000 H. P. capacity,' the feed water to pass through a sufficient length of coil to heat same with exhaust steam to 200 deg., and this water to be further heated to not less than 255 deg., by taking sufficient water from boiler to raise feed water to that temperature. Heater to contain a coke chamber large enough to properly filter water enough to supply sufficient feed water for 1,000 H. P. boilers. Heaters to have all necessary fittings to operate the same, and guaranteed to supply as pure water as any appliance in use.

## "PUMPS.

"Boilers to be supplied with six Duplex pumps of standard make and of suitable size to supply all the boilers when operating at a medium speed. One extra pump to be supplied and to be used as a fire pump or feed pump in case of the breaking down of either of the six before mentioned.

"Six circulating pumps to pump sufficient water into filter to raise the temperature of feed water to 255 deg., before passing through filter. All the above pumps to be of first-class make and to be kept in repair for contractor for at least one year.

### "FOUNDATIONS, ETC.

"A concrete foundation two feet deep, twelve feet wide and the full length of the building for each of the three rows of boilers; if any deeper foundation is necessary the company is to stand the expense of same. All of the brickwork exposed to the fire to be of fire brick, the balance to be good red brick. All brickwork to be laid in fire clay.

### "CASTINGS.

"Boilers to have good substantial cast-iron base with ash doors as near air-tight as possible. One cast-iron plate on top with suitable manholes to enter smoke box. Grate bars with suitable openings for firing with nut or slack coal.

### "STACK.

"One stack 13 feet diameter by 178 feet from base. Base, bottom ring 8 feet long and knees to be 3-8 inch iron, and the balance 1-4 inch. Suitable foundation bolts and washers supplied and stack to be constructed so as to resist all storms. No 'guy rods' to be used. Suitable upstakes and horizontal flue No. 8 iron as may be designed by the company's architect.

### "STEAM PIPES.

"All necessary steam pipes of such diameter, thickness, and length as may be designed by the com-

pany, with all valves, ells, tees, flanges that may be necessary to connect boilers with engines. Any expansion joints that may be needed to be supplied by the company.

"RECAPITULATION.

"Boilers to be erected, all connections to be made that are necessary to connect feed pumps, heaters and filters, steampipe to engines, exhaust pipe from engines, stack erected complete, all flue connections from boiler, the whole to make a complete plant ready for steam. All work to be first-class, and all modern devices used, necessary for the safe operation of the plant—the erection to be done under the supervision of your chief engineer, but any changes made by him to be adjusted by a committee of arbitration, composed of one appointed by your company, but not your engineer, one appointed by us, the third selected by the two mentioned. The decision of this committee to be final."

"PROPOSAL.

"July 8, 1889.
"*Municipal Electric Light & Power Company*.
"GENTLEMEN:—We propose to make and erect boilers as per specifications, and guarantee plant to be as economic as any plant in use, for the sum of $18.50 per horse power, said horse power to be demonstrated by actual test.

"We agree to have fourteen boilers ready for use by December 15, 1889, and the balance by January 20, 1890, and any failure on our part to comply with the terms of this contract will compel us to pay a forfeit of $25 per day for every day after the time above mentioned.

"We propose to complete revolving grate bars and automatic stoker on seventh boiler on north row, for the sum of $3,020.

"Will complete the thirteen boilers to be fired by hand, so as to leave as little work as possible when needed to use in connection with stoker, for the sum of $2,250. Or will complete whole plant with revolv ing grate and stoker, for $10,200.

"ROHAN BROS. BOILER MFG. CO.,

"JJR."

The answer then denies that the boilers had the capacity claimed, and alleges that the defendant had paid for more than the six thousand horse power con tracted for, and that the boilers erected failed to com ply with the specifications and proposal aforesaid, in various particulars to the damage of defendant in the sum of $53,000, for which judgment is asked.

The reply denies generally the allegations of the answer; admits, however, certain deviations from the terms of the contract on various grounds, and alleges that defendant accepted the boilers as if done in con formity with the specifications.

On the trial the plaintiff admitted the contract as set out in the answer, and that such contract was not afterward modified, or changed by the parties; introduced parol evidence tending to prove that the work was done under the supervision and direction of defendant's agent appointed for that purpose, and was accepted as conforming to the contract; admitted that the amount paid by defendant is equal to the full amount of six thousand horse power at $18.50 per horse power, and all extras charged for; and then made the following offers of proof by oral testimony.

"Mr. Noble: The plaintiff offers to prove by cer tain witnesses, by Mr. Rohan and others, that at the time that this agreement was entered into there was

within the contemplation of the parties as expressed by the president, then acting, of the defendant company, and by the chief engineer of the defendant company, then acting, the mechanical engineer and the superintendent of the works, then acting, the intention that the contract as made should not be confined to six thousand horse power, but that the contractors should have the benefit of all horse power over six thousand that the boilers would produce within the limits of the boilers as described in the specifications. We propose to prove that, not only in general but in particular, by Mr. Rohan, who was secretary of the plaintiff contracting company, by Mr. Sutter, the president of the defendant company, by Mr. Viernow, the architect, and the mechanical engineer, and by Mr. Branham, who was at the time the consulting engineer, and by Mr. Shea, who was at that time the practical engineer. And we further offer to prove by the same parties and by the experts, Mr. Jones and Mr. O'Brien, who made the examination, that the said boilers did have a capacity in excess of six thousand to the extent of double that amount, that is, to the extent of twelve thousand horse power, and that they had that when they were delivered and accepted by the defendant, and that they were used by the defendant with that capacity in connection with the Hamilton–Corliss engine, which was the engine understood and agreed at the time upon which the horse power was to be measured in connection with the horse power of the boilers themselves.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Mr. Noble:* I omitted in our offer one or two material points. In addition to the foregoing offer and to be placed along with the same, we offer to prove that the price of $18.50 was arrived at at the time it was fixed in the contract by the expression between the

parties of the purpose to pay that amount for all the horse power developed on the boilers to the extent of three hundred horse power to each boiler or six thousand horse power for the whole and for every horse power in excess thereof. And we further offer to prove that at a period in the construction of the boilers when we had constructed thirteen, so that there was developed upon the same an amount of horse power equal at least to six thousand horse power, the defendant company through its chief officers then requested that we should proceed to erect the remainder of the boilers for the reason that there was space enough within the building to do so and they wished to occupy all the space and the purpose of their agreement was to get all of the power within the space they had for the purposes of their company, and that, thereupon, and with the understanding and contemplation of the parties theretofore expressed, we did go on and build the remainder of the boilers for them with that understanding.

"*Mr. Ferriss:* We offer to prove by Mr. Sutter, the president of the defendant company, at that time, at the time the contract was made, and by Mr. Rohan, who represented the other contracting party, the Rohan Brothers, that Mr. Rohan stated to them before the contract was made that he expected to produce at least ten thousand horse power in this plant to be erected under this contract. We offer to prove further that at the time of the making of this contract, as a matter of fact, the horse power capacity of these boilers could not be ascertained and was not known and that the parties to the contract so recognized and stated. And we offer to prove that this was a new type of boiler and that for that reason the parties recognized and agreed with each other that the capacity could be determined only by an actual test, and that the purpose was not to obtain a boiler plant of six thousand horse power, but a

boiler plant of the largest horse power possible within that space.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Mr. Ferriss:* I wish to make one more offer of proof. I offer to prove that the defendant and the contractor, Rohan Brothers, agreed that the ultimate capacity of this boiler plant would largely exceed six thousand horse power; that the work to be done by the plant within their contemplation at the time the contract was made exceeded that requirement of six thousand horse power and that the parties agreed that the contractor should furnish all the horse power possible within the space provided in excess of six thousand horse power and that payment should be made for every horse power so furnished at the rate of $18.50 per horse power, to be demonstrated by actual test."

\*    \*    \*    \*    \*    \*

"*The Court:* Do you offer to prove any different or other agreement besides the agreement which is embodied in these specifications and proposals?

"*Mr. Noble:* No, your honor, but we do offer to prove that at the time of the contract and in connection with it, both before and after, the conduct and expressions of the parties contracting, which we will set forth by the witnesses in detail, were such as would show that it was within the contemplation of the parties that that contract would cover more than six thousand horse power or three hundred horse power on each boiler if developed and demonstrated by actual test."

To each of these offers the defendants (first taking leave to strike out that part of the answer which questions the capacity of the boilers in suit) objected, on the ground that the offer was too general, that the evidence was incompetent as varying the terms of the

written contract, and that, as the agreement made had been reduced to writing, the terms of the written contract could alone be looked to to ascertain the intention of the parties.

The court sustained the objections, and in passing on the admissibility of the evidence ruled "that the specifications are to be considered as a part of the contract. Taking the specifications and proposal together they make a contract whereby the plaintiff agreed to furnish a certain plant of boilers the capacity of which should not be less than six thousand horse power and that the defendant agreed to pay for them at the rate of $18.50 per horse power and that it was not within the power of the plaintiff to put in a plant there which should be in excess of that capacity and claim compensation for the excess."

Thereupon the plaintiff took a nonsuit and his motion to have the same set aside having been overruled, he brings the case here by appeal.

It will thus be seen that the plaintiff seeks to recover in this action, upon the contract set out, for five thousand, four hundred horse power in excess of the six thousand, which has been paid for; and to have the value of such excess enforced as a mechanic's lien against the plant, which it is conceded is now owned by other parties than those to the contract.

The errors assigned are that the court committed error in construing the written contract, and in refusing the parol testimony offered, plaintiff's contention being, *first*, that under the true construction of the contract, the payment was to be made at $18.50 per horse power for all the power which could be economically produced upon the nineteen boilers erected, as determined by actual test; *second*, that if this is not the construction of the contract upon its terms, the court should have admitted the testimony offered as

tending to show the real intention of the parties to the agreement, and what should be its true construction.

1.   There can be no doubt that the proposal and specifications are to be taken together as the written contract between the parties and the ultimate expression of their intentions in the premises.   The terms in which those intentions are expressed are those chosen by the plaintiff, and are not to be extended by construction to include anything beyond that which is fairly included within those terms, as they would appear as a whole and complete proposal to an intelligent business mind, when presented for acceptance.

Treating, then, the proposal and specifications as the contract between the parties, all the terms of which are to be given force and effect according to their natural and ordinary meaning in the connection in which they are used, and without giving any undue prominence or weight to one term over another by reason of its being in one part or another of the contract, a fact to which the ordinary business mind would attach no importance, let us, omitting those features of the contract which have no bearing upon the present controversy, endeavor to write the material portions of the contract in the terms thereof, as they would appear to such a mind when presented for acceptance.

The accepted proposal which became the contract would then assume this form:   "We propose to make and erect   *   *   *   a boiler plant of 6,000 H. P. and all necessary appurtenances, boilers to be twenty in number, and to be at least 300 H. P. each, and to stand a working pressure of at least 110 lbs. to the sq. in.   *   *   *   Heaters to be six in number, each of 1000 H. P. capacity.   *   *   *   Heater to contain a coke chamber large enough to properly filter water

enough to supply sufficient feed water for 1,000 H. P. boilers. * * * And guarantee plant to be as economic as any plant in use for the sum of $18.50 per horse power, said horse power to be demonstrated by actual test.''

The parties to this contract must be presumed to have been ordinarily prudent business men. Such men ordinarily do not enter into contracts requiring the investment of such a large sum of money as did the one in hand without a definite understanding of the proximate cost of such an undertaking. Nor do they ordinarily leave the question of such cost within very large limits to be determined at the power or pleasure of the other party to the contract, as, for instance, whether the cost should be $111,000 or $210,900 or a greater amount, as the power or pleasure of the plaintiff might determine in this case, if the quantity of horse power to be produced was left indefinite by this contract as contended for by his counsel.

Doubtless, contracts of this character are sometimes made, but when the salient features of this contract are brought into their natural and orderly juxtaposition in the manner suggested, and the whole of its terms are read in such connection, in the sense and manner in which those terms are ordinarily used in the business world, there can be little doubt that the parties thereto intended to contract, and did contract, for a certain, definite, and specific thing, to wit, ''a 6,000 H. P. boiler plant.'' They said so in so many words when speaking of the thing in gross, and this was also the thing they provided for in the requirement; for its component parts, twenty boilers each of three hundred horse power capacity; six heaters each of one thousand horse power capacity, and six filters each of sufficient capacity for one thousand horse power boilers, all point to a six thousand horse power plant

as the thing to be furnished and paid for at $18.50 per horse power. The two last appliances not only point unmistakably to such a plant, but are absolutely inconsistent with the idea that a plant of a much larger and indefinite capacity over six thousand horse power could have been intended.

But it is insisted that as under the contract the *boilers* were to be *at least* three hundred horse power each, the maximum capacity of the power to be furnished was not defined, and plaintiff's contention may be maintained. But to do so, would be to give the words *at least* an undue and controlling influence over the other terms of the contract, with which such a construction is inconsistent, for the parties could not have contemplated a ten or twelve thousand horse power plant as contended for to be run by appliances which were only required to be of a capacity to furnish six thousand horse power.

It is also insisted that as the horse power furnished was to be "demonstrated by actual test," and to be paid for at so much per horse power, an indefinite quantity of horse power must have been contemplated. But these features of the contract as well as the use of the words *at least* in the connection stated, are not at all inconsistent with the idea that a plant of only six thousand horse power was contemplated.

If twenty boilers were to furnish six thousand horse power, and they were to be shapely and uniform in size and character, it would be necessary that they should each be of a capacity of three hundred horse power. It was perfectly natural, therefore, to require that they should not be of less capacity than that, for the six thousand horse power plant contemplated, and as it could not be told whether that quantity of horse power had been furnished until it was measured, there is nothing inconsistent with the same idea in the

requirement that the quantity furnished should be demonstrated by actual test.

The fact that the power furnished was to be paid for at so much per horse power is a matter of but little significance one way or the other.   It is matter of common knowledge that in perhaps the great bulk of commercial transactions, where given quantities are unquestionably contracted for, the contracts assume this form. Given quantities of wheat, corn, and oats, etc., are contracted for daily at so much per bushel; sugar, cotton, etc., at so much per pound, and other products at so much per gallon.   It detracts nothing from the definiteness of these contracts that the products are to be measured and paid for at so much per bushel, pound, or gallon, as the case may be; why should it in the case in question where a quantity of horse power is to be furnished at so much per horse power.   The only difference we can see is that as this product may not be susceptible of exact measurement before completed, and in condition for delivery, the parties in contracting that it should be of a certain quantity, and not less, might have had in contemplation a slight excess unavoidable by reason of this inherent quality.   Further than this, the contract in question can not be extended without doing violence to some of its terms, and shutting our eyes to its general scope and tenor.

We therefore conclude that the court below properly construed the contract.

The immediate cause, however, that moved the plaintiff to take a nonsuit, was the refusal of the court to admit the parol evidence offered, and this action of the court is made the ground of his alternative complaint, which remains to be considered.

2.   In order to obviate the necessity of extended discussion of this branch of the case the offers of proof have been set out at length, *in haec verbae*.   The writ-

ten contract which we have construed and in explanation
of which this evidence is offered, is couched in plain,
ordinary language, the meaning of which is obvious to
any intelligent mind.   It is not suggested that there is a
word, or a phrase, in it, material to this controversy,
that has a peculiar or recondite meaning, that calls for
extrinsic evidence for its proper interpretation.   Nor
is any such evidence called for in order to make a
proper application of the terms to the subject-matter,
which is clearly described in terms as plain as human
language is capable of.   The written contract needs no
explanation, its plain and easy terms explain them-
selves, when duly considered in relation to each other
and to their context in the whole contract.   Where,
then, is a place for the introduction of parol evidence
in the case?

Counsel for plaintiff say it is to show the real
intention of the parties.   But where a contract is
reduced to writing, and is therein plainly and intelligi-
bly stated in the language of the parties, such written
contract is "the best possible evidence of the intent and
meaning of those who are to be bound by the contract,
and of those who are to receive the benefit of it."   1
Greenleaf Ev. [15 Ed.], sec. 276.   The real intention
of the parties is to be discovered in the terms of the
written instrument itself.   "When parties have delib-
erately put their mutual agreements into the form of a
completed written contract, that expression of their
intention should be accepted as a finality, in which is
merged all prior negotiations within the scope of the
writing."   *Tracy v. Union Iron Works,* 104 Mo. 193,
and cases cited.   This is settled law in this state.

The substance of the numerous and voluminous
offers is to prove by the declarations, conversations,
and communings between the parties that it was their
intention that the plaintiff should furnish all the power

that the boiler plant would produce, not less than six thousand horse power, and that the defendant should pay for all of such power at the rate of $18.50 per horse power, and some facts as reasons for having such intentions, and thus by parol to construct a contract for the parties not within the terms of the written agreement, in violation of the time-honored and much approved rule, excluding evidence of cotemporaneous or prior verbal agreements varying the terms of a written contract. This the court would not permit, and, in so doing, we think, committed no error. The judgment is affirmed. All concur.