WILLIAM H. WATERS, INC., Respondent, *v.* MARTIN MARCH and Others, Individually and as Surviving Copartners Trading under the Firm Name and Style of CARLOWITZ & Co., Appellants.

First Department, February 2, 1934.

*Harold D. Beatty* of counsel [*Bigelow & Beatty*, attorneys], for the appellants.

*Arnold Lichtig* of counsel [*Charles S. Rosenschein* with him on the brief; *Arnold Lichtig* and *Herbert A. Mossler*, attorneys], for the respondent.

UNTERMYER, J. The plaintiff, a manufacturer of hatters' furs, for many years has been a purchaser of hareskins from which are

clipped the fur used in the manufacture of hats. The defendants, composing the firm of Carlowitz & Co., are merchants in China hareskins, with offices in several cities of China, where such skins are produced for export. They have sold China hareskins to the plaintiff at various times since 1925 through Bingham & Co., their selling agent in the United States.

The controversy which has resulted in this litigation arises out of three contracts for the sale to the plaintiff of raw China hareskins, each of which forms the basis of a separate cause of action contained in the complaint for alleged breach of warranty. In connection with these sales three written contracts were executed by the parties, dated December 13, 1928, January 11, 1929, and January 14, 1929. These contracts are identical in form. The first contract in point of time will, therefore, serve as illustrative of all. It provides:

" SALE NOTE

" General Import Dept. " No. IF 165

" BINGHAM & Co., INC.,
" 104 Pearl St.
" New York

" Telephones
" Bowling Green 5930–37 "*December* 13, 1928

" Sold to W. H. Waters, Inc., 225 Greene Street, New York City.

" For Account of Messrs. Carlowitz & Co., Tientsin, China, Bingham & Co. Inc. Agents.

" Quantity, About 100,000 — One Hundred Thousand

" Description, Raw China Hareskins, 80% No. 1 — 20% No. 2 Winter hair Type A

" Position, To be shipped at China to New York direct and/or indirect January and/or February and/or March 1929.

" Price, At Nine and three-quarter cents (9¾c) each, ex dock New York.

" Terms, Net cash on the 16th day of the month following the arrival of the goods in New York.

" Conditions, Sale subject to present tariff, any change for account of buyers. Any additional U. S. duty and/or tax effective before the completion of this contract is for buyer's account; sellers will not be held responsible for inability to ship due to strikes, fires, civil commotion, war, cyclone, or any contingencies beyond their control. Disputes regarding delivery or quality are to be settled by New York arbitration, but sellers reserve the option either to pay amount of claim allowed by arbitration, or refund the amount paid by buyer for the merchandise and to take the merchandise in return, thus cancelling this contract, and rescinding the sale.

Any claim or demand for arbitration to be made within fifteen days after the arrival of the merchandise, and while and unopened 10% of the shipment is available for sampling. Notice of shipments to be given as soon as received. No arrival, no sale.

"BINGHAM & CO., INC.

"*Agents.*

"(Signed) R. M. SKINNER

"*Vice-Pres.*

"No Responsibility Assumed by Selling Brokers Except by Special Agreement.

"Accepted Dec. 14, 1928.

"WILLIAM H. WATERS, INC.

"*President.     Buyers.*"

The contract of January 11, 1929, in similar form, is for the sale of 150,000 skins, which are described as "Raw China Hareskins, 95% No. 1 — 5% No. 2 winter hair, Type A;" that of January 14, 1929, is for 50,000 skins, described as "Raw China Hareskins, 80% No. 1 — 20% No. 2, winter hair." On the face of each contract appears the following: "All correspondence should be addressed to the firm and not to individuals. Contracts not binding unless signed by the firm."

The present action is for damages for breach of a warranty alleged to have been given by representatives of Bingham & Co. early in December, 1928, to the effect that the No. 1 quality skins would yield four pounds and the No. 2 quality skins two and two-thirds pounds of fur, for each one hundred skins; furthermore, that both No. 1 and No. 2 quality skins would be delivered flat, with the pelt uncracked and free from sand. These warranties are not contained in the contracts of sale, as the plaintiff appears to have realized, for in its bill of particulars it sets forth that the agreements were partly oral and partly written, the written portion corresponding to the written contracts of sale, and that, except as contained in the written contracts, the warranties were oral.

The plaintiff's cause of action depended upon its ability to establish that the merchandise delivered was not in accordance with the contracts of sale. For that purpose the plaintiff was entitled to establish the meaning of "No. 1" and "No. 2" hareskins, of "winter hair" or "Type A." To do this, parol evidence was, of course, proper and necessary. (*Emmett* v. *Penoyer*, 151 N. Y. 564; *Walls* v. *Bailey*, 49 id. 464; *Dana* v. *Fiedler*, 12 id. 40; *Gumbinsky Bros. Co.* v. *Smalley*, 203 App. Div. 661; affd., 235 N. Y. 619; *Newhall* v. *Appleton*, 114 id. 140; *American Aniline Products, Inc.*, v. *Mitsui & Co., Ltd.*, 190 App. Div. 485.) But beyond this the plaintiff should not have been permitted to go. If the hare-

skins delivered were in accordance with the written contracts as thus explained, then the plaintiff was not entitled to recover, even if they were not in accordance with the parol warranty. The court should, therefore, have limited the proof on this point to the meaning to be attributed to these provisions of the written contracts. (*Lossing* v. *Cushman*, 195 N. Y. 386, at p. 389.) This was not done. The plaintiff's president was permitted to testify that the defendants had verbally warranted that the No. 1 and the No. 2 skins delivered under the contracts would yield, respectively, four pounds and two and two-thirds pounds of fur to each one hundred skins. After testifying to the yield of fur ordinarily to be expected from No. 1 and No. 2 skins of type A quality, he testified to conversations early in December, 1929, with Mr. Perry, a salesman of Bingham & Co.: "Mr. Perry came to the office and offered us another lot of China hareskins, and I said ' No,' I would not buy any further quantities of China hareskins; that the yields had not been holding out and I would only buy on the strength that Mr. Perry would guarantee the yield." He testified that a few days later Mr. Perry returned with Mr. Skinner, the vice-president of Bingham & Co., who then consented to make this guaranty or warranty of yield. This evidence was received upon the theory that if the defendant might explain the meaning of the trade symbols which the contract contained, the plaintiff was entitled to establish an express warranty, to which the written contract made no reference. In receiving this evidence the trial court said: " If the contract is not complete in one respect, it is not a complete contract and therefore it does not prohibit the oral testimony rule." And again the court ruled: " Explaining is a modification. It is something in addition thereto. I may be a little bit non-technical in saying ' modification.' You are certainly calling upon the doctrine of parol evidence yourself to explain your own contract. * * * The same contract prepared by you, you say that you need parol evidence to show what type A is. You need parol evidence to show what quality 1, quality 2, are. Then I say that they must have the same right to show what the contract was."

We think that there was error in these rulings and also in the charge of the court submitting to the jury the issue of the existence of an express warranty of quality. The testimony to which we have referred had no relation to the meaning attributable to the written contracts nor to any question of implied warranty. Its effect was to extend the defendants' obligations under the contract by requiring them to deliver not merely skins as therein described but skins which in addition would yield the specified quantity of fur. It was one thing to allow the symbols descriptive of the mer-

chandise to be translated into intelligible terms for the consideration of the jury and quite another to receive proof of an express parol warranty of the merchandise so described. The first involved an explanation; the second, an extension of the written contract. The court also in its charge very carefully discriminated between the import of the written contracts and the existence of an express warranty, but erroneously submitted both questions to the jury. After stating the contentions of the parties concerning the meaning of the written contracts, the court charged: "However, the plaintiff goes further and alleges that there are express warranties of quality in this case. I charge you that if Mr. Perry and Mr. Skinner did have such authority to make the express warranties as claimed by the plaintiff, and they did say that these skins would be of the quality as Mr. Waters claims they represented, then there was a warranty of quality, and if the skins that were furnished were not equal to the specifications that were made by Mr. Perry and Mr. Skinner, then there is a breach of an express warranty." It is thus evident that the theory of the complaint as amplified by the bill of particulars, the theory on which the evidence was received and the theory also on which the case was submitted to the jury, was that the plaintiff was entitled to recover upon proof of an express warranty of yield even though it rested exclusively in parol.

We think the judgment cannot be affirmed without disregarding the established rule of law that a written contract merges all prior and contemporaneous negotiations and oral promises relating to the same subject and that when the terms of the agreement are reduced to writing by the parties the written contract is conclusively presumed to integrate their entire engagements. Here the written contracts appear in all respects to be complete, and, being so, must be presumed to have exhausted the intentions of the parties on the subject of these sales. They specify the seller and the buyer, the price, the terms of payment, the quantities to be sold, the dates of shipment and other usual conditions of sale. Among those conditions reference is made to "this contract" and across the face of the instrument appears the statement that "Contracts" are not binding unless executed by the firm. The plaintiff also recognized this to be so, for after executing the contracts of January 11 and January 14, 1929, it returned them in each instance with a letter in which reference is made to the inclosure as the "signed contract." Indeed, the most careful inspection of the written contracts would lead no one to suspect the existence of any stipulation relating to the sales which the parties had not included therein.

But, it is contended, the written contracts here are not complete, because it has been established to the satisfaction of the jury that

so much of each transaction as constituted the warranty was not included therein and that, therefore, the real contract is provable as existing partly in writing and partly in parol. The answer to this contention is that the contracts appear upon inspection to be in all respects complete and that beyond this our inquiry may not go. (*Thomas* v. *Scutt*, 127 N. Y. 133.) We may not have recourse to the parol evidence to ascertain whether they do in fact include the entire agreement of the parties. To do so would nullify the rule, for as the court observed in a leading case (*Eighmie* v. *Taylor*, 98 N. Y. 288), " if we may go outside of the instrument to prove that there was a stipulation not contained in it, and so that only part of the contract was put in writing, and then, because of that fact, enforce the oral stipulation, there will be little of value left in the rule itself." For obvious reasons this does not apply where the writing is manifestly fragmentary. (*Routledge* v. *Worthington Co.*, 119 N. Y. 592; *Thomas* v. *Nelson*, 69 id. 118.) But where the contract is complete upon its face, as it is here, it is conclusively presumed to integrate the final intentions of the parties and may no more be extended by the inclusion of additional terms than it may be contradicted by parol. (*Thomas* v. *Scutt, supra; Lese* v. *Lamprecht*, 196 N. Y. 32; *Loomis* v. *N. Y. C. & H. R. R. R. Co.*, 203 id. 359; *Johnson* v. *Oppenheim*, 55 id. 280; *Wilson* v. *Deen*, 74 id. 531.)

Nor can the parol warranty be sustained as collateral on the theory that the plaintiff executed the written contracts in consideration of the separate and independent agreement of the defendants that the skins delivered would produce a specified quantity of fur. It is very true that a collateral undertaking may, within well-settled limitations, be established by parol. " Contracts are frequently made that are collateral to, but independent of, a written contract and they can be properly established by oral testimony. Evidence of such contracts is sometimes referred to as an exception to said general rule. It is more accurate to say that collateral and independent contracts can be shown by oral testimony because it was not the intention of the parties thereto to include such contracts in the writing. Collateral contracts are thus frequently established by oral testimony, because they are collateral." (*Lese* v. *Lamprecht, supra*, 36.) An illustration of a collateral agreement, often cited, is *Jeffery* v. *Walton* (1 Stark. 267), decided by Lord ELLENBOROUGH in 1816. There the parties had executed a written memorandum setting forth a contract for the hiring by the defendant of the plaintiff's horse. The horse having shied and been injured, the plaintiff was permitted to prove that it was verbally agreed that the defendant would compensate the plaintiff if, in consequence of

shying, the horse sustained injuries. The court referred to this parol understanding as " suppletory matter " by which the parties provided for a special contingency not covered by the written contract of hire. But before such a collateral stipulation may be shown, the following conditions, stated in *Mitchill* v. *Lath* (247 N. Y. 377), must exist: " (1) the agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing; or put in another way, an inspection of the written contract, read in the light of surrounding circumstances must not indicate that the writing appears ' to contain the engagements of the parties, and to define the object and measure the extent of such engagement.' Or again, it must not be so clearly connected with the principal transaction as to be part and parcel of it." Assuming all the other conditions to exist, the parol agreement, which is relied on as collateral, does not satisfy the third.

The parol warranty was inseparably connected with the subject-matter of the written contracts. The subject-matter of those contracts was the sale of hareskins. The warranty was incidental to the sale. It affected the identity of the merchandise contracted to be sold. It was an element or detail of the principal transaction which contracting parties " would ordinarily embody in their written contract." Indeed, it would be difficult to imagine a closer relation than exists between a contract for the sale of merchandise and a warranty of quality. Such a warranty, even if collateral, was so closely related to the sale that it perished when the other terms of the agreement were reduced to writing by the parties. (*Eighmie* v. *Taylor, supra.*) To allow it to be established by parol would result in the serious impairment of a rule which experience has shown to be useful and necessary. *Chapin* v. *Dobson* (78 N. Y. 74), principally relied on by the respondent, appears also to have been relied on by the trial court. Always regarded as " near the border line " (*Thomas* v. *Scutt, supra*, 138), it was recently said (*Mitchill* v. *Lath, supra*, 383) that it " is rarely cited except to be distinguished." It was also plainly intimated (p. 383) that many of the decisions (*Morgan* v. *Griffith*, L. R. [6 Exch.] 70; *Erskine* v. *Adeane*, L. R. [8 Ch. App.] 756, and *Batterman* v. *Pierce*, 3 Hill, 171), strongly relied upon in *Chapin* v. *Dobson*, are not in harmony with controlling decisions in this State. Even when approved, it has been only as an illustration of " the familiar rule that if the writing does not contain on its face the entire agreement between the parties, parol, not inconsistent with its terms, may be received, not to contradict it but to show the real contract.

But this rule does not apply when it appears from inspection of the instrument that it was intended to express the full and complete intention of the parties." (*Ruppert* v. *Singhi*, 243 N. Y. 156, at p. 160.) If this, indeed, is all that was decided, then *Chapin* v. *Dobson* does not concern us here.

It need only be added that many decisions in other jurisdictions accord with the conclusions which we have expressed. Such is the rule in the United States courts (*DeWitt* v. *Berry*, 134 U. S. 306; *Seitz* v. *Brewers' Refrigerating Co.*, 141 id. 510), in England (*Pickering* v. *Dowson*, 4 Taunt. 779; *Chanter* v. *Hopkins*, 4 M. & W. 399), and in other jurisdictions (*Glackin* v. *Bennett*, 226 Mass. 316; *Telluride Power Co.* v. *Crane Co.*, 208 Ill. 218; *Storage Co.* v. *Woods*, 99 Mich. 269; *Naumberg* v. *Young*, 44 N. J. L. 331; *Michigan Pipe Co.* v. *Sullivan County Water Co.*, 190 Ind. 14; *Miller* v. *E. L. & P. Co.*, 133 Mo. 205: *Thompson* v. *Libby*, 34 Minn. 374; *Case Plow Works* v. *Niles & Scott Co.*, 90 Wis. 590; *Bullard* v. *Brewer*, 118 Ga. 918; *Quinn* v. *Moss*, 45 Neb. 614; *Battery Co.* v. *Railway Co.*, 138 Iowa, 369; *Griffin* v. *Runnion*, 74 W. Va. 641; *Ehrsam* v. *Brown*, 64 Kan. 466; *Wilcox* v. *Cate & Bunker*, 65 Vt. 478).

The judgment should be reversed and a new trial ordered, with costs to the appellants to abide the event.

FINCH, P. J., TOWNLEY and GLENNON, JJ., concur; MERRELL, J., dissents and votes for affirmance.

MERRELL, J. (dissenting). This action was brought to recover damages for an alleged breach of warranty on three separate sales of China hareskins for which the plaintiff contracted with the defendants, a firm doing business in China. The contracts in suit were negotiated by the firm of Bingham & Co., acting as the representative of the defendants in this country. These hareskins involved in the three contracts were purchased by the plaintiff for the purpose of obtaining the fur therefrom in the manufacture of hats, in which the plaintiff was engaged. The contracts in question were three in number and were partly in writing and partly oral, the written contracts being substantially identical in their general terms, and were dated, respectively, December 13, 1928, January 11, 1929, and January 14, 1929. The only difference in these contracts was in relation to the quantities and assortments of the hareskins. The purchase price of all of the skins embraced in the three contracts was paid by plaintiff, and plaintiff brings this action to recover damages against the defendants by reason of the breach of warranty as to the quality of the skins purchased. When the skins arrived in this country they were found, upon inspection, to be defective and not up to the warranty under which

the plaintiff claims the skins were sold to it. When the plaintiff demanded of the defendants a settlement of the damages caused by the defendants' breach of the contracts, the defendants originally claimed only that plaintiff had not given timely notice after the arrival of the merchandise as to it not being up to contract. However, upon the trial and upon this appeal the contention of the defendants seems to be that the court erred in receiving oral testimony in explanation of the written contracts between the parties. An examination of these contracts clearly discloses that they were ambiguous, and that the written description of the goods in the contracts or " sales notes " was only symbolic, and that, therefore, the court very properly permitted oral testimony to explain what was meant by the symbols contained in the sales notes. For example: In the description of the goods sold under the first of the sales notes, we find that the contract related to " Raw China Hareskins, 80% No. 1 — 20% No. 2 Winter hair Type A." This statement in the sales notes conveys no description whatever of what goods were intended to be sold. In the second of the sales notes, under date of January 11, 1929, the description was: " Raw China Hareskins, 95% No. 1 — 5% No. 2 winter hair, Type A." In the sales note of January 14, 1929, the merchandise was described as: " Raw China Hareskins, 80% No. 1 — 20% No. 2, winter hair." The plaintiff was an old customer of the defendants and had dealt with the defendants for many years, commencing in 1925, and during the years following 1925 had been the exclusive purchaser of China hareskins from the defendants. In fact, the evidence shows that the plaintiff was a pioneer in the purchase of these hareskins, and that for many years it was the defendants' sole customer and outlet for its hareskins in this country. Originally the purchase of the hareskins was made by sample, and as to the shipments in accordance with the samples no complaint appears to have been made. Between the parties there appeared to be an understanding as to the amount and weight of fur that each 100 hareskins should produce. Thereafter purchases of hareskins were made by the plaintiff of the defendants without samples being exhibited, and the hareskins delivered under these purchases were found to be defective. Instead of being hareskins taken during the winter months, when the fur was heavy, many of the skins were taken during the summer months or during the spring and fall, when the yield of hair was not so great; many of the skins were cracked and twisted, and contained sand, necessitating added expense in cutting the hair from the skins, the knives used for that purpose becoming dull and requiring frequent sharpening. According to the testimony of William H. Waters, representing plaintiff,

the plaintiff was waited upon by two representatives of Bingham & Co., American agents of the defendants, namely, Herbert H. Perry, a salesman, and Ralph M. Skinner, who was vice-president of Bingham & Co. Bingham & Co. was the exclusive agent in America of the defendants. The testimony shows that between 1925 and 1928 the plaintiff purchased from defendants nearly 1,000,000 of the China hareskins. In December, 1928, according to the testimony of Waters, the salesman, Perry, called upon him and offered him China hareskins. Waters testified that he said he would make no further purchases of the defendants' goods because the yield on former deliveries had not been holding out and that unless the yield on the assortment of eighty per cent No. 1 and twenty per cent No. 2 would be three and one-half pounds to the hundred skins, which was what such skins should yield, the plaintiff would make no further purchases. Waters also claimed that the prior skins had been knotted, twisted and cracked, and that they could be opened only with difficulty and causing enormous waste. Waters stated that unless the yield was as stated by him the plaintiff could not make any money. Perry then stated that he would confer with his superior, Skinner. Later on both Skinner and Perry returned to see Waters, and the earlier conversation was repeated, and Skinner then stated, according to the testimony of Waters: " We will guarantee a yield of $3\frac{1}{2}$ pounds to the hundred," and stated that the skins would be full winter skins, and that in the assortment of eighty per cent No. 1 and twenty per cent No. 2, there would be a yield of at least three and one-half pounds per one hundred skins, the yield from No. 1 skins to be at least four pounds and from No. 2 skins at least two and two-thirds pounds. Waters also insisted that the skins be delivered " opened and stretched " and " free of sand," stating that on previous occasions there had been sand imbedded in the fur, resulting in the knives being nicked and requiring frequent sharpening. Following this conversation Waters stated that he would take 100,000 skins at nine and one-quarter cents per skin. Thereafter the sales note of December 13, 1928, was mailed to the plaintiff together with a letter reciting that the sales note was inclosed in duplicate " to cover your purchase under to-day's date." A copy of this letter was signed by Waters and returned to Bingham & Co. There were similar negotiations as to the two following sales of January 11 and 14, 1929. When the goods arrived they were found not to be up to contract, and complaint was made and, according to the terms of the contract, it was suggested by plaintiff that arbitration be had, but to that Skinner, the vice-president of Bingham & Co., replied that there would be no arbitration; that they had gotten

along without trouble, and would do so in this case, and that they had been doing business with the plaintiff for so many years that it should " go ahead, and if the yield does not pan out," the defendants would make good. There is no question upon the evidence that the goods were not up to contract. The appellants insist that the receipt of the oral testimony of Waters with reference to his conversations with the representatives of Bingham & Co. prior to the execution of the sales notes and leading up thereto, was improper and in violation of the rule against varying written contracts by oral testimony. I think the contention of the plaintiff, that the written description in the sales notes was only symbolic, was correct, and that oral testimony to make clear what was meant by the symbols and ambiguous provisions of the sales notes was entirely proper. It seems to me that oral testimony was properly received showing what was contemplated by the contracts. For anything that appears, the defendants might have delivered to the plaintiff under the contracts hareskins that would have yielded no fur whatever, or little or none. It is, therefore, right for the plaintiff to show what was meant by the contracts by the terms used in the sales notes. The oral testimony in no way disputed the provisions of the sales notes, but was confirmatory thereof and in explanation of said sales notes. The sales notes did not completely embrace the oral agreements previously entered into, and parol evidence not inconsistent therewith was properly received in amplification thereof. It clearly appeared that the agents were authorized to make the warranties. While to some extent the testimony of Waters as to these warranties was disputed by Perry and Skinner, that merely presented a question of fact which the jury resolved in favor of plaintiff.

It is also the contention of appellants that the court erred in refusing the appellants the right to show what the habits of the defendants were with relation to sales to third parties. I think this had nothing whatever to do with what the contract was between the plaintiff and the defendants. And it is also claimed by the appellants that the court improperly refused the appellants the right to show the custom in the trade not to make warranties of the goods in question. Of course, this is absurd on the face, and there could be no custom which would nullify a contract between the parties.

It is also the contention of the appellants that the verdict was a compromise one, and, therefore, cannot be upheld. In answer to this, the damages sought to be recovered were unliquidated, and it was for the jury to say just what damages, under the evidence, the plaintiff had suffered.

The appellants also find fault with the addition of interest to the judgment appealed from. Under the provisions of section 480 of the Civil Practice Act, interest was properly included in the recovery. (See, also, *McLaughlin* v. *Brinckerhoff*, 222 App. Div. 458; *Sweeney* v. *State of New York*, 251 N. Y. 417; *Joannes Brothers Co.* v. *Lamborn*, 226 App. Div. 174.)

The issues in the case were submitted to the jury in a very exhaustive and admirable charge. I see no prejudicial error in anything that the court said in charging the jury.

Even in the absence of an express warranty as to the goods embraced in the contracts and their quality and yield, 1 think, in view of the past dealing between the plaintiff and the defendants, when the plaintiff, for a number of years, purchased from samples, and during which an understanding had grown up between the parties as to what the yield would be in the type of goods embraced in the contracts, that an implied warranty on the part of the defendants existed that the goods would be up to the quality and yield of those formerly purchased by the plaintiff of the defendants by sample. I do not think the plaintiff is at all dependent upon the establishment of an express warranty, and that there was an implied warranty here as to the quality and yield of the hareskins.

The judgment appealed from should be affirmed, with costs to plaintiff, respondent, against defendants, appellants.

Judgment reversed and a new trial ordered, with costs to the appellants to abide the event.