Vacuum Concrete Corporation of America *v.*
Berlanti Construction Company, Inc.,
Appellant.

Argued September 15, 1965. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*Robert B. Greer*, with him *Butler, Beatty, Greer* and *Johnson*, for appellant.

*William C. Archbold, Jr.*, with him *Louis A. Bloom, Leonard L. Creskoff*, and *Kassab, Cherry, Curran and Archbold*, for appellee.

OPINION BY MONTGOMERY, J., November 10, 1965:

Plaintiff-appellee Vacuum Concrete Corporation of America (Vacuum Concrete) in an action of assumpsit recovered a judgment against the defendant-appellant Berlanti Construction Company, Inc. (Berlanti) following a nonjury trial before Hon. FRANCIS J. CATANIA. In the same action a counterclaim filed by Berlanti was dismissed. These appeals by Berlanti followed.

The basic facts are not seriously in dispute and may be recited as follows. In October, 1958, the City of Newark, New Jersey, invited bids for the construction of a dam forming part of its Charlotteburg Reservoir Project. The specifications prepared by its engineers,

Parsons, Brinckerhoff, Quade and Douglas, included the use of a patented method or process[1] of Vacuum Concrete or an approved equal, in finishing certain areas of the dam. Following this invitation for bids Vacuum Concrete, Inc. (now Vacuum Concrete Corporation of America, by merger) distributed a memorandum to prospective bidders on the project in which it stated, inter alia:

"1. Vacuum Concrete Inc. will make available through the Furnival Machinery Company for a period not to exceed one month—Op. (1) Vacuum pump and sufficient Vacuum processing mats, hose lines, Vacuum-test cylinders, fittings, etc. to make the Vacuum process operative, transportation of equipment to and from Philadelphia to the job site, all for the sum of $1,775.00.

"2. If the equipment is retained on the project for a period in excess of one (1) month, an additional charge of $250.00 per week will be made. All equipment remains the property of the Furnival Machinery Company.

"3. Vacuum Concrete Inc. will provide a qualified Vacuum Concrete supervisor at the job site at the rate of $275.00 per week. One week of supervision usually is sufficient to properly train the contractor's forces in the use of Vacuum processing.

"4. Compensation for design and engineering by Vacuum Concrete Inc.—$2000.00.

"5. For Vacuum processing the following crew is normally required:

    1—Vacuum Pump Operating Engineer
    2—Laborers
    1—Cement Finisher

---

[1] The purpose of the vacuum process or method was to withdraw water rapidly from freshly poured concrete, thereby giving the concrete a tough, hard surface with greater resistance to abrasion, wear, and to the effect of freezing and thawing.

"Fuel for the Vacuum Pump at approximately $8.00 per day will be furnished by the contractor.

"It should be noted that the only personnel furnished by this company is the Vacuum supervisor, who will instruct the contractors' men in the proper application of the Vacuum Concrete processes.

"This office will also furnish technical advice and general suggestions as to recommended procedures to assist the contractor on the job."

Berlanti was awarded the contract by the City of Newark and shortly thereafter, on July 30, 1959, it issued the following purchase order to Vacuum Concrete, which order was accepted by Vacuum Concrete in January of 1960:

"DATE 7/30/59

VACUUM CONCRETE INC.
1010 Girard Trust Bldg.
Philadelphia 2, Penna.

Attention—Mr. Jacob J. Creskoff

Description

Furnish in strict compliance with plans & specifications prepared by Parsons, Brinckerhoff, Hall & MacDonald—Vacuum Concrete methods equipment and supervision for the above mentioned project—as per your quotation dated 11/10/58—(Contract item 5-121)"

Later, on March 11, 1960, Vacuum Concrete submitted what is called a "Revised Proposal" to Berlanti which is as follows:

"March 11, 1960

PROPOSAL

Berlanti Construction Company
P. O. Box 65

Newfoundland, New Jersey
RE: Revised Proposal, Charlotteburg, Reservoir Project
CRP-5—Dam and Reservoir

---

Gentlemen:

1. We will sell you a truck-mounted vacuum pump in good working condition for the sum of $6,500.00 and agree to re-purchase this unit from you, if in good operating condition, reasonable wear and tear excepted, for the sum of $3,250.00 at the completion of the vacuum processing operation.

2. We will rent you all of the vacuum mats required for the processing of the unformed concrete surfaces together with all vacuum hose and other special equipment required for this operation for the sum of $2,000.00.

3. *Supervision*: We will furnish you a supervisor to train your forces in the operation of the vacuum processes at the rate of $275.00 per calendar week. Our lump sum price includes one week of supervisor's time.

4. *License*: The lump sum price includes $1.00 as payment for the license to use our patented processes on this project.

5. *Lump Sum Price*: $8,776.00.

6. *Delivery*: All of the above equipment will be delivered to your site by May 1, 1960.

7. *Terms*: $5,526.00 due and payable upon delivery of the equipment; the balance of $3,250.00 due and payable upon completion of the vacuum processing on this job should you elect to retain ownership of the truck-mounted vacuum pump.

Very truly yours,

VACUUM CONCRETE, INC.

Jacob J. Creskoff
Executive Vice President

AGREED AND ACCEPTED:
BERLANTI CONSTRUCTION CO.
BY: [S] Berlanti Constr. Co.    DATE: April 4, 1960"

This new proposal was accompanied by a separate letter which reads as follows:

"March 11, 1960

Mr. Gene Berlanti
Berlanti Construction Company
P. O. Box 65
Newfoundland, New Jersey
RE: CHARLOTTEBURG DAM, NEWFOUNDLAND, NEW JERSEY
Dear Mr. Berlanti:

Sam Hillman and I enjoyed meeting you, Fred Lee and the others and inspecting your job.

In reviewing the file on your job, I note that although Mr. Harris informed you that the vertical surfaces could be processed, that he did not inform you that such a procedure would be very costly per square foot of processing in view of the limited re-uses of the forms which would have to be adapted for vacuum processing. Accordingly, I feel that it is only proper to *recommend* that the vertical surfaces or any other surfaces which would require mats other than our standard or modified standard vacuum mats should not be processed.

I enclose our *new proposal* for this project, the only change in which involves the purchase of a truck mounted pump by you rather than the rental of one. This purchase will save you money should you require our equipment longer than the estimated period. (Emphasis supplied)

Very truly yours,
VACUUM CONCRETE, INC.
[S] Jacob J. Creskoff
Jacob J. Creskoff
Executive Vice President"

The new proposal was accepted by Berlanti on April 4, 1960, and on May 10, 1960, Berlanti accepted delivery of the equipment contemplated by the new proposal. On May 25, 1960, it accepted delivery of 15 special vacuum mats.

On the basis of the foregoing, the lower court concluded that the revised proposal constituted the entire contract between the parties. It interpreted it to be a contract for the sale and rental of equipment. It interpreted the provision concerning supervision as meaning only that the supervisor was to train Berlanti's men in the proper use of the vacuum processing equipment and not to supervise the actual work. However, in arriving at this conclusion the lower court did express an opinion concerning the meaning of the "Memorandum to all Bidders" issued by the plaintiff on November 10, 1958, as well as the letter, of March 11, 1960, from Vacuum Concrete to Berlanti which accompanied the revised proposal. It concluded that neither of these documents indicated anything but a contract of hiring of the machinery and equipment required by the patented process, with the necessary supervisory service to train Berlanti's employes in its use as was the basic intention of the revised proposal. From our close scrutiny of the record we are of the opinion that there is sufficient evidence to support these findings of the lower court.

Berlanti now argues that the specifications to which reference is made in its purchase order became part of the contract and impose a greater obligation on the part of Vacuum Concrete than those found by the lower court to exist. It contends that Vacuum Concrete was obligated to guarantee the desired results from the use of its process and equipment.

Undoubtedly, Vacuum Concrete was aware of the specifications because they are referred to many times in the negotiations and in its memorandum to bidders. On this point the lower court said:

"The only other element in this case which Vacuum Concrete was required to prove was that the equipment which it furnished to Berlanti was capable of performing the type of work to be done. The evidence in this case, presented by Vacuum Concrete, established to our satisfaction that the equipment supplied under the contract met the standards required during the time it was used on this project. On May 31, 1960, Vacuum Concrete demonstrated the equipment to the satisfaction of Berlanti and this was confirmed by the Engineer for the City of Newark in charge of the project. At this same time a concrete mix was prepared by Jacob Creskoff, President of Vacuum Concrete, at the request of the City Engineer. The City Engineer, who had charge of the mix, instructed Berlanti's men to employ the same ratio.

"Vacuum Concrete had no duty to prepare this mix and had no control over this phase of the operation. Berlanti contends among other things that it was the failure of the mix designed by Jacob Creskoff that caused the vacuum processing to fail. But, we can find no provision under the written contract which required Vacuum Concrete to supply the formula for the mix and as we stated before the entire tenor of the writings between the parties indicated an agreement in the nature of a sale and lease contract and nothing more. Furthermore, the evidence indicated that the formula prepared by Jacob Creskoff was not adhered to by the contractor."

The record in this case is long and much of it deals with the question of responsibility for the formula or mix of the concrete. Tests were made of plaintiff's method or process, some of which failed. However, the city engineers finally approved the use of the process and equipment after a successful demonstration in one of the tests. Therefore, at the outset it was known that the success of the process was not certain. Neverthe-

less the engineers authorized the defendant to proceed with its use.

In all of this record we find no express warranty by plaintiff that its method and equipment would produce the desired results. The mere reference to the specifications made by defendant in its purchase order did not create such a warranty because the same instrument referred to plaintiff's original memorandum to bidders which contained no such warranty. The purchase order was submitted "as per your quotation dated 11/10/58." The specifications were part of the contract between Berlanti and the city but Berlanti would have them made part of its contract with Vacuum Concrete although it does not plead a breach of warranty. However, should we consider the matter as though such a breach had been properly pleaded and the original memorandum to bidders and the purchase order and acceptance thereof, together with the specifications, as part of the contract, it would not support defendant's contention.

We shall not discuss the parol evidence rule or the propriety of admitting into evidence Vacuum Concrete's letter of March 11, 1960, in view of our subsequent discussion in which we are assuming that defendant's position had been established.

In the absence of an express warranty defendant's argument must depend on an implied warranty of fitness for a particular purpose. Section 2-315 of the Uniform Commercial Code of April 6, 1953, P. L. 3, 12A P.S. §2-315, provides that, "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

Under the Sales Act of May 19, 1915, P. L. 543, §15, 69 P.S. §124, now repealed, it was specifically provided that there would be no warranty of quality or fitness implied in the sale or rental of an article under its patent or other trade name. *Demos Construction Co., Inc. v. Service Supply Corporation,* 153 Pa. Superior Ct. 623, 34 A. 2d 828 (1943); *Hobart Manufacturing Company v. Rodziewicz,* 125 Pa. Superior Ct. 240, 189 A. 580 (1937).

Although the lower court found that the machine and equipment did meet the standard required of it, we are constrained to say further that defendant's use of same did not depend on its reliance on plaintiff's skill and judgment but was upon its own judgment and that of the city engineers following the initial tests. From these tests, or at least one of them, they became satisfied of the suitability of plaintiff's equipment and methods to accomplish the desired results. Under these circumstances no implied warranty of fitness arose. Furthermore, the specifications set forth many of the details of operation required by the city. Not only did they dictate when the mats were to be placed, and for what length of time, and that they were to be left in place as weather conditions varied, but they also provided that the mixtures of concrete were to be designed by the city's engineers.[2] These provisions together with

---

[2] "Sec. 5-12A2 *Composition*: The cementitious materials for concrete shall at the option of the City, consist of either Portland cement, separately or with fly ash (Alternative 1) or Portland cement, separately or with natural cement (Alternative 2). The other materials composing the concrete shall be fine and coarse aggregate, water, air entraining admixture, and (where directed by the Engineer) retarding densifier admixture.

"Sec. 5-12A3 *Quality*: The concrete mixtures will be designed by the Engineer, who will designate the required quality of concrete for the structures covered by these Specifications. The proportions of the concrete ingredients and the water-cement ratio may be changed by the Engineer to suit the work or the nature of the materials

the provisions for tests of Vacuum Concrete's equipment and methods before being put to use refutes any argument that defendant relied on plaintiff's skill and judgment as to create an implied warranty of fitness.

Undoubtedly the cost of using plaintiff's method and equipment was contemplated by defendant when it submitted its bid as general contractor to the City of Newark. If, subsequently, the city decided to eliminate the use of that method and provide a substitute therefor, as it did when it ordered defendant to cease using Vacuum Concrete's process and equipment and to substitute a different mixture of concrete, any loss by such change should be adjusted between defendant and the city. Plaintiff's process and equipment were provided and used. Although the results attained were not those desired this was not plaintiff's responsibility. Plaintiff is therefore entitled to recover for the sale and rental of its equipment and process, and is not liable for any loss defendant sustained in its efforts to accomplish the results desired by the City of Newark.

Judgments affirmed.

---

being used, and the Contractor shall be entitled to no extra compensation by reason of such changes. The mix proportions and appropriate water cement ratio will be determined on the basis of procuring concrete having suitable workability, density, impermeability, durability and strength, with the use of the minimum amount of cement. The water content of all concrete mixtures shall be the minimum necessary to properly place the mixture being used, as determined by the Engineer.

"Tests of the concrete will be made by the Engineer, and the mix proportions shall be changed whenever necessary for the purpose of securing the required economy, workability, density, impermeability, durability or strength, and the Contractor shall be entitled to no additional compensation because of such changes."