B. Marvin POTLER, Esq., as Trustee in
Bankruptcy for Underwater Advisors
Corporation, Plaintiff,

v.

MCP FACILITIES CORP. and Bethlehem
Steel Corporation, Defendants.

No. 76–C–854.

United States District Court,
E. D. New York.

June 8, 1979.

Eugene Feldman, New York City, for plaintiff.

Eaton, Van Winkle, Greenspoon & Grutman, New York City, for defendant MCP Facilities Corp.; Samuel N. Greenspoon, Richard E. Hahn, Gary A. Woodfield, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant Bethlehem Steel Corp.; William F. Martin, Jr., New York City, of counsel.

BARTELS, District Judge.

Plaintiff, B. Marvin Potler, as trustee in bankruptcy for Underwater Advisors Corporation ("UAE"), brings this diversity action [1] against MCP Facilities Corp. ("MCP") and Bethlehem Steel Corporation ("Bethlehem") to recover $81,250 in damages, including expenses and lost profits, allegedly suffered by UAE as a result of its inability to complete an underwater painting job for Bethlehem at Beaumont, Texas. Plaintiff's claim against MCP, from which UAE purchased the underwater paint called "Steelmate," is for breach of warranty arising from the failure of that paint to adhere properly. His claim against Bethlehem, for which UAE agreed to perform the underwater painting services, is for breach of contract stemming from the alleged requirement by Bethlehem, in its plans and specifications, that UAE use Steelmate. Both defendants, MCP and Bethlehem, move pursuant to Fed.R.Civ.P. Rule 56 for summary judgment.

MCP's motion is predicated upon six grounds which invoke the application of various provisions of Article Two of the Uniform Commercial Code ("UCC"): (1) the action is barred by the statute of limitations; (2) there can be no liability for breach of express warranty because (a) UAE could not have relied on any representations by MCP and (b) any evidence pertinent thereto is barred by the parol evidence rule; (3) there can be no implied warranty of fitness for a particular use because UAE could not have relied on MCP's skill or judgment; (4) UAE's reservation of a right to inspect negates all implied warranties; (5) all warranties were expressly excluded; and (6) remedies were limited to replacement of defective paint. Bethlehem's motion is predicated upon the ground that Texas law precludes recovery. Plaintiff opposes the motions and contends that there are material issues of fact to be tried.

### FACTS

In July 1971, Bethlehem revised its plans to renew the fender system of the 1,100' bulkhead at its Beaumont, Texas yard to include a coating of the underwater piles with an anticorrosive paint. On February 2, 1972, Bethlehem issued plans and specifications for the Beaumont job, including anticorrosive painting. Section 7 of the plans and specifications requires that the paint system used at the Beaumont job be "Steelmate" as manufactured by MCP or an "approved equal," with such approval to be granted prior to the award of the contract.

Bethlehem had previously used Steelmate, for example, at its Key Highway Shipyard in Baltimore, Maryland, and had tested and commissioned tests of Steelmate and the water at Beaumont. On January 27, 1972, it sent to MCP for review information concerning the water at Beaumont. On February 7, 1972, MCP certified to Bethlehem that B.C. Research, to which MCP had sent the information, found nothing in the water at Beaumont that would affect Steelmate.

---

1. An action against MCP Facilities Corp. ("MCP") was commenced in the United States District Court for the District of Maryland in August 1974 and then transferred pursuant to 28 U.S.C. § 1406(a) to the Eastern District of New York. On May 10, 1976, a second action was filed, adding Bethlehem Steel Corporation ("Bethlehem") as a defendant, which was merged and consolidated with the first, transferred action.

The plans and specifications additionally provide at paragraph 13 of the General Conditions:

"Bidder should carefully examine the plans, specifications and other documents, visit the site of the work and fully inform himself as to all conditions and matters which can in any way affect the work or costs thereof. Should a bidder find discrepancies in, or omissions from the plans, specifications or other documents, or should he be in doubt as to their meaning and intent, he should notify the Owner at once and obtain clarification prior to submitting a bid. The submission of a bid by the bidder shall be conclusive evidence that the bidder is fully acquainted with and satisfied as to the character, quality and quantity of work to be performed and materials to be furnished."

On February 2, 1972, Bethlehem forwarded copies of the plans and specifications to its purchasing department in Beaumont with instructions to obtain a minimum of six bids for the work. On February 8, 1972, UAE wrote a letter to Bethlehem at Beaumont in which it referred to a telephone conversation of the previous day, proposed to perform the coating services at Beaumont, submitted its prices, and described its experience applying Steelmate underwater on another Bethlehem job:

As you are probably aware, we recently completed the painting of approximately 28,000 square feet of steel H–pile in Bethlehem's Key Highway Shipyard in Baltimore. No one has anywhere near the experience that we have in applying this material under water. I can tell you from experience that learning the technique of applying this product under water can be costly. We have mastered this technique and are hereby offering an unsolicited proposal to perform this service.

The Key Highway job was performed by UAE with Steelmate ordered in July 1971 from MCP, which, according to UAE, represented that it would adhere, and was UAE's only experience with Steelmate prior to the Beaumont job as well as its first application of paint underwater. At Key Highway, Steelmate adhered temporarily at first but, after a few months, no longer did so.[2]

In response to its February 8 letter, an invitation to bid was forwarded to UAE on February 15, 1972. The invitation to bid includes a paragraph identical to ¶ 13 of the plans and specifications quoted *supra* as well as the following:

Where any material is mentioned by trade name, manufacturer's name, or model numbers and catalog numbers, the same is not a preference for said material but is used to establish a desired type or quality of material. Materials and equipment of other manufacturers which are the equivalent or better in quality will be accepted by the Company. The successful bidder shall submit in writing to the Company's Purchasing Department a list and description of all materials and equipment which he proposes to substitute for the material specified and no substitution will be Permitted except that for which written approval is granted by the Company's Purchasing Department.

UAE officers and employees visited the Beaumont job site and saw what work was to be done and where and how it would be done. UAE did not test Steelmate but, UAE contends, it had conversations and correspondence with MCP concerning Bethlehem's requirements and the ability of Steelmate to perform. According to UAE, it informed MCP of the intended use of Steelmate and MCP represented that the product would be able to perform the Beaumont job.

On March 3, 1974, UAE wrote Bethlehem that, after having "carefully examined" the specifications for the Beaumont job, it was proposing a joint venture with Coastal Construction Company ("Coastal") to do the fender and coating work. Coastal was to do the fender work and UAE, using the

2. The Key Highway Shipyard job is the subject of Bethlehem's counterclaim in the present action.

same divers who had applied Steelmate at Bethlehem's Key Highway Yard, was to do the underwater coating. After final negotiations in Beaumont, on April 17, 1972, Bethlehem, UAE and Coastal executed the contract for the Beaumont job in Texas. That contract specifically incorporates the plans and specifications and provides in paragraph 17:

> The Contractor hereby represents that prior to the execution of this Agreement it has visited the Site and that opportunity has been given to it for, and it has made, any and all investigations desired relative to the condition of the Site and the character of the Work and the condition and circumstances under which the Work must be performed, and, furthermore, that it has examined and clearly understands the plans and every clause and section of this Agreement and of the specifications hereto attached. The Contractor agrees that it will not make any claim for any extra compensation, damage or extension of time for completion based upon any alleged misunderstanding of this Agreement or of said plans or said specifications or because of lack of information concerning, or alleged misrepresentation of, the condition of the Site, the character of the Work or the conditions under which this Agreement is to be performed.

UAE claims that it requested Bethlehem to make an investigation of a substitute for Steelmate. As early as May 1971, UAE wrote Bethlehem informing it that a representative of International Paint Company would be in touch concerning its marine paints. No substitute paint system was approved by Bethlehem.

To carry out its contract with Bethlehem, UAE purchased 450 gallons of Steelmate from MCP. Pursuant to UAE's directions (confirmed subsequently by UAE's purchase order dated April 25, 1972 and received by MCP on May 1, 1972) MCP delivered the first shipment of approximately 200 gallons of Steelmate to Eastern Express, Inc., ("Eastern") at Bath, Pennsylvania on April 26, 1972. That first shipment was delivered to Bethlehem for UAE at Beaumont on May 5, 1972. According to UAE, its transaction with MCP continued until July 1972. A Steelmate brochure, dated August 1971, and the labels of every gallon of Steelmate contain the following language, of which UAE denies knowledge:

## IMPORTANT NOTICE TO PURCHASER

The following is made in lieu of all warranties, expressed or implied. Seller's and manufacturer's only obligation shall be to replace such quantity of the product proved to be defective. Neither seller nor manufacturer shall be liable for any injury, loss or damage, direct or consequential, arising out of the use of or the inability to use the product. Before using, user shall determine the suitability of the product and its intended use, and user assumes all risk and liability whatsoever in connection therewith. The foregoing may not be altered except by an agreement signed by the officers of seller and manufacturer.

UAE began work under the contract as scheduled on May 8, 1972, but was unable to complete the job because Steelmate would not adhere. During the period of time when UAE attempted to perform, UAE contends that MCP represented to UAE and Bethlehem that Steelmate would adhere and attempted to change the paint's formula. On June 16, 1972, Bethlehem received a letter from UAE stating that it was closing down its part of the Beaumont job due to the failure of Steelmate to properly adhere to the pilings. UAE returned the unused Steelmate to MCP and was credited with the paint returned. Bethlehem subsequently retained MCP to do the coating work, but it too failed. Bethlehem asserts that it never received any form of written request from UAE for payment for work performed on the Beaumont job.

I. *MCP'S MOTION*

1. *Statute of Limitations*

■ MCP asserts that plaintiff's action is time barred because filed more than four years after the cause of action accrued.

UCC § 2–725(1). MCP contends that plaintiff's cause of action for breach of warranty accrued when MCP, pursuant to UAE's instructions, tendered delivery of the first shipment of Steelmate to the shipper, Eastern, on April 26, 1972, or, at the latest, when that first shipment reached Beaumont on May 5, 1972.

Although plaintiff's second action was not filed in New York until May 10, 1976, an identical claim was asserted by plaintiff against MCP in a prior action filed in Maryland and transferred to this court pursuant to 28 U.S.C. § 1406.[3] It is well established that a district court may transfer a case pursuant to 28 U.S.C. § 1406 even in the absence of personal jurisdiction over defendant and that the filing of the action in the transferor district tolls the statute of limitations. *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); *Smith v. Peters*, 482 F.2d 799 (6th Cir. 1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 886 (1974); *Taylor v. Love*, 415 F.2d 1118 (6th Cir. 1969), *cert. denied*, 397 U.S. 1023, 90 S.Ct. 1257, 25 L.Ed.2d 533 (1970). Plaintiff's action is not time barred.

### 2. *Liability for Breach of Express Warranties*

MCP maintains that it cannot be held liable for an alleged breach of express warranties because (a) UAE could not have relied on any representations or warranties allegedly made by MCP and (b) the parol evidence rule bars evidence of any such representations. We find no merit in either contention.

### (a) Reliance

▉ In order for an affirmation of fact or promise, a description of the goods or a sample to create an express warranty, it must become "part of the basis of the bargain." UCC § 2–313. MCP contends that the buyer must therefore rely on the warranty and that, since UAE was obligated by its contract with Bethlehem to purchase Steelmate, there could be, as a matter of law, no reliance on and no inducement by any representations made by MCP.

Reliance, if required,[4] is a question of fact not amenable to summary judgment. Plaintiff asserts that UAE did, in fact, rely on MCP's representations and that representations were made prior to the time that UAE contracted with Bethlehem. UAE's subsequent contractual obligation to use Steelmate cannot, as a matter of law, preclude a finding that, in fact, MCP's representations induced UAE's purchase of Steelmate and entrance into the contract with Bethlehem.

### (b) Parol Evidence Rule

[3] MCP next claims that the introduction of evidence of representations made prior to the contract of sale is barred by the parol evidence rule, UCC § 2–202. It asserts that UAE's purchase order constitutes "a complete and exclusive statement of the terms of the contract," thus preventing even evidence of consistent additional terms. UCC § 2–202(b). We disagree. In *William H. Waters, Inc. v. March*, 240 App. Div. 120, 269 N.Y.S. 420 (1st Dep't 1934), upon which MCP relies, written contracts appeared upon inspection to be in all respects complete. In contrast, in this case, careful examination of the purchase order would lead one to suspect the existence of stipulations relating to the sale which the parties had not included therein. The purchase order form confusingly provides, on the one hand, "For *prompt payment* mail invoice showing order number with bill of lading *after shipment* is made," and, on the other hand, "Goods subject to our inspection, notwithstanding *prior payment* to obtain cash discount." (Emphasis supplied.) In addition, the purchase order contains no clause repudiating prior negotiations between the parties and no language stating that the order is intended to be the full and

---

3. *See* note 1 *supra.*

4. *See* 1 Anderson, *Uniform Commercial Code* § 2–313:18 (2d ed. 1970); White & Summers, *Uniform Commercial Code* §§ 9–2 & 9–4 (1972); "Article Two Warranties in Commercial Transactions," 64 Cornell L.Rev. 30, 50 (1978).

complete contract between the parties. *Compare FMC Corp. v. Seal Tape Ltd.*, 90 Misc.2d 1043, 396 N.Y.S.2d 993 (Queens Co. Sup.Ct. 1977). Nor are the terms of the purchase order inconsistent with the existence of express warranties. We would conclude, therefore, that the purchase order was not intended by the parties to constitute a fully integrated written contract and thus that evidence of consistent, additional terms, for example, express warranties, is admissible.

### 3. Implied Warranty of Fitness for Particular Use

■ An implied warranty of fitness for a particular use arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." UCC § 2–315. MCP contends that there can exist no implied warranty of fitness for a particular use because UAE could not have relied on MCP's skill or judgment because it purchased Steelmate pursuant to its contractual obligation with Bethlehem and by trade name. On the contrary, plaintiff asserts that UAE relied upon representations of MCP in entering into the contract with Bethlehem. This obviously is a question of fact not amenable to summary judgment.

Thus, for example, in *Vacuum Concrete Corp. of America v. Berlanti Construction Co.*, 206 Pa.Super. 548, 214 A.2d 729 (1965), the court found, *after trial*, that plaintiff did not rely on the seller's skill or judgment but rather on its own judgment following the making of tests and held that there was no implied warranty of fitness for a particular use. Similarly, designation of goods by a trade name "is only one of the facts to be considered on the question of whether the buyer actually relied on the seller, but it is not of itself decisive of the issue." UCC § 2–315, Official Comment 5. Nor does plaintiff's alleged breach of its contract

with Bethlehem by failing to test Steelmate require the court to hold, as a matter of law, that UAE did not rely on MCP's skill and judgment.

### 4. Right to Inspect Does Not Negate Implied Warranties

■ Another MCP contention is that UAE's reservation in its purchase order of a right to inspect, its contract with Bethlehem, and its claimed expertise in applying Steelmate required UAE to make a thorough examination of the paint and its failure to do so negates all implied warranties. UCC § 2–316(3)(b) provides:

> [W]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

MCP asserts that UAE, as a professional buyer, "assumed the risk as to all defects which a professional buyer in the field ought to observe." UCC § 2–316, Official Comment 8. Plaintiff responds that, by its letter of February 8, 1972, UAE did not hold itself out as an expert on Steelmate, although it had previously used the product at another location. Plaintiff adds that only actual application of Steelmate to the pier at Beaumont would have revealed the defect.

At all events, there are other factual questions which preclude summary judgment upon this ground. For example, what defects a buyer with the skill of UAE[5] ought to observe, using the normal method of examining paint, presents an issue of fact. MCP's own analyses apparently did not disclose the defect. The court cannot conclude from the material submitted on this motion that even a professional buyer should foresee that Steelmate would not adhere.

---

**5.** Plaintiff denies that Underwater Advisors Corporation ("UAE") was an expert concerning the chemical qualities of paint or its ability to

adhere under different environmental conditions but admits that UAE's divers had experience mechanically applying paint under water.

MCP also relies on UAE's failure to test Steelmate prior to actual application. However, MCP did not demand that UAE so test the paint. Such a demand is necessary under UCC § 2–316(3)(b).[6] Neither UAE's reservation of a right to inspect nor its contract with Bethlehem, as to which MCP does not claim third-party beneficiary status, satisfied as a matter of law the demand requirement.

### 5. *All Warranties Were Not Expressly Excluded*

MCP argues that, by language of disclaimer[7] printed on the label of every gallon of Steelmate and in a brochure relied on by UAE, it expressly excluded all warranties, express and implied. Plaintiff replies that the putative disclaimer is ineffective for numerous reasons.

#### (a) Implied Warranties

█ The purported disclaimer does not exclude the warranty of merchantability which requires, *inter alia,* that goods be "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label." UCC § 2–314(2)(c) & (f). Although such a disclaimer may be oral or written, "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability." UCC § 2–316(2).[8] "The warranty of merchantability, wherever it is normal, is so commonly taken for granted that its exclusion from the contract is a matter threatening surprise and therefore requiring special precaution." UCC § 2–314, Official Comment 11. *Roto-Lith, Ltd. v. F. P. Bartlett & Co.,* 297 F.2d 497 (1st Cir. 1962), upon which MCP relies exclusively, disregards this plain statutory command.[9] New York courts have required, however, that disclaimers mention "merchantability." *E. g., Zicari v. Harris Co.,* 33 A.D.2d 17, 304 N.Y.S.2d 918 (4th Dep't 1969). We believe we must follow the example set by *Zicari* rather than *Roto-Lith* and hold that the language printed on MCP's brochure and labels does not exclude or modify the warranty of merchantability.[10]

**6.** Official Comment 8 to UCC § 2–316 provides in pertinent part:

In order to bring the transaction within the scope of "refused to examine" in paragraph (b) [of UCC § 2–316(3)], it is not sufficient that the goods are available for inspection. There must in addition be a demand by the seller that the buyer examine the goods fully. The seller by the demand puts the buyer on *notice that he is assuming the risk of defects* which the examination ought to reveal. The language "refused to examine" in this paragraph is intended to make clear the necessity for such demand.

**7.** The language, *supra,* is ambiguous. The provision blurs the distinction between warranty and remedy. It purports to exclude all warranties and, in lieu thereof, to limit liability to replacement of defective paint. No standard is therefore supplied to gauge whether the paint is defective.

**8.** The warranty of fitness for normal use is a part of the implied warranty of merchantability and must be distinguished from the warranty of fitness for a particular use under UCC § 2–315. Whether an exclusion of the warranty of fitness for normal use must comply with the requirements set forth in UCC § 2–316(2) for (i) the warranty of merchantability "or any part of it" or for (ii) "any implied warranty of fitness"

is subject to debate. See 1 Anderson, *supra* note 4, § 2–316:21. Official Comment 4 to UCC § 2–316 appears to adopt the view that "any implied warranty of fitness" should be read as "any implied warranty of fitness for a particular use." Therefore, to exclude the warranty of fitness for normal use, one must comply with the requirements set for the warranty of merchantability.

**9.** White and Summers conclude that "one is hard pressed to justify the court's disregard of the plain statutory command, and it is unlikely that courts in the future will follow *Roto-Lith.*" *Supra* note 4, § 12–5 at 357 (footnote omitted).

**10.** It is unnecessary at this time to reach plaintiff's contention that MCP's attempted disclaimer is not conspicuous as required by UCC § 2–316(2). If, however, the question is later presented, the test is not whether UAE had actual knowledge of the language excluding warranties, as suggested by plaintiff, but whether "a reasonable person against whom it is to operate ought to have noticed it." UCC § 1–201(10); *Architectural Aluminum Corp. v. Macarr,* 70 Misc.2d 495, 498, 333 N.Y.S.2d 818 (N.Y. Co. Sup.Ct. 1972); 1 Anderson, *supra* note 4, § 2–316:23.

### (b) Express Warranties

In its claim for breach of express warranty, UAE relies on certain representations allegedly made by MCP's officers and employees concerning the ability of Steelmate to perform the Beaumont job as well as affirmations of fact in MCP's brochure,[11] for example, that "Steelmate is not moisture sensitive" and "can be applied on submerged surfaces." Plaintiff maintains that MCP's attempted exclusion of all warranties is irreconcilably inconsistent with these express warranties and thus inoperative under UCC § 2–316(1), which provides:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

The alleged representations [12] and the statements in MCP's brochure conflict with MCP's attempted disclaimer of all warranties. MCP's express warranties cannot be reasonably construed to be consistent with its attempted full disclaimer. *See Walcott & Steele, Inc. v. Carpenter*, 246 Ark. 95, 436 S.W.2d 820 (1969); *Woodbury Chemical Co. v. Holgerson*, 439 F.2d 1052 (10th Cir. 1971). MCP's attempted disclaimer of express warranties is therefore inoperative.[13]

### 6. *Remedies Were Not Limited to Replacement of Paint*

MCP argues that, by its disclaimer, it expressly limited plaintiff's recovery to replacement of defective paint and that, by granting UAE a credit for the paint returned, it has fully satisfied its contractual obligation. Plaintiff seeks consequential damages and asserts that his remedies are not limited.

We agree with plaintiff that his remedies were not validly limited to replacement of defective paint. New York courts have held that the "merchantability" requirement of UCC § 2–316(2) extends to remedy limitations as well as disclaimers. Thus, where language attempting to both negate warranties and limit remedies fails to mention "merchantability" such that the implied warranty of merchantability is not validly excluded, remedies available to plaintiff upon breach of that warranty are not validly limited. *Zicari v. Harris Co., supra*; *Stream v. Sportscar Salon, Ltd.*, 91 Misc.2d 99, 397 N.Y.S.2d 677 (Queens Co. Civ.Ct. 1977). Accordingly, we find that plaintiff's remedy for breach of the warranty of merchantability is not limited to replacement of defective paint.

In addition, the exclusive remedy of replacement [14] may well have "failed of its essential purpose" so that, instead, remedy may be had as provided in the Uniform Commercial Code. UCC § 2–719(2); *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968). "[W]here an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." UCC § 2–719, Official Comment 1. *See* "Article Two Warranties in Commercial Transactions," 64 Cornell L.Rev. 30, 232–39 (1978). Here, it is alleged that MCP adjusted the formula of Steelmate and finally

---

11. MCP's brochure contains descriptions of Steelmate as an underwater paint which, if part of the basis of the bargain, constitute express warranties under UCC § 2–313. *E. g., Pennsylvania Gas Co. v. Secord Brothers, Inc.*, 73 Misc.2d 1031, 343 N.Y.S.2d 256 (Chautauqua Co. Sup.Ct. 1973), *aff'd*, 44 A.D.2d 906, 357 N.Y.S.2d 702 (4th Dep't 1974).

12. The parties have not addressed the question whether plaintiff will be precluded pursuant to UCC § 2–202 from introducing evidence of representations orally made by MCP's officers and employees in order to contradict the written disclaimer.

13. It is unnecessary at this time to resolve whether MCP's attempted disclaimer is unconscionable. UCC § 2–302.

14. The provision in MCP's brochures and on the Steelmate labels does not even provide for the remedy of refund.

attempted to perform the Beaumont job itself but again the product would not adhere under water. Replaced paint similarly would not adhere under water and such a remedy would be meaningless. Moreover, at the hearing on the motion, it was disclosed that Steelmate may have been withdrawn from the market. For these reasons, UAE allegedly did not and could not receive non-defective replacement paint that conformed to the contract.

## II. *THE BETHLEHEM MOTION*

■ Plaintiff asserts that Bethlehem, in its plans and specifications, required the use of Steelmate and that consequently it is liable for damages incurred as a result of UAE's inability to perform the coating work at Beaumont. Bethlehem claims that, even assuming that it required the use of defective paint, which is open to question, or that its specifications were themselves defective, plaintiff cannot recover under Texas law.[15] Plaintiff replies that Texas law permits recovery and states that accordingly there are issues of fact precluding summary judgment.

As authority for its position, Bethlehem relies on a seventy-two year old Texas case, *Lonergan v. San Antonio Loan & Trust Co.*, 101 Tex. 63, 104 S.W. 1061 (1907), *rehearing denied*, 101 Tex. 63, 106 S.W. 876 (1908). There, a contractor agreed to construct a building according to plans and specifications devised by plaintiff owner's architect, started work, and, when the nearly completed building fell, refused to replace it and abandoned the work. When the owner sued, the contractor defended on the ground that the building fell due to defects in the plans and specifications the sufficiency of which the owner expressly or impliedly guaranteed. The court rejected this defense. Instead it held that, notwithstanding that the building fell solely because of weakness arising out of defects in the specifications and without any fault on the part of the contractor, the contractor was liable for the loss incurred as a result of its failure to comply with the agreement to construct and complete a building in accordance with the contract and specifications.

In *Lonergan*, the court rejected the contention that, as a matter of law and without regard to the intention of the parties, the owner impliedly guaranteed the specifications. Such a guarantee, the court held, "must be found expressed in the language of the contract, or there must be found in that contract such language as will justify the court in concluding that the parties intended that the [owner] should guarantee the sufficiency of the specifications to [the contractor]." 104 S.W. at 1066.[16]

Bethlehem analogizes the case at bar to *Lonergan* ; here, work using material required by the owner's plans and specifications allegedly could not be accomplished, whereas in *Lonergan*, structurally defective work performed in accordance with the owner's plans and specifications was destroyed. We have serious doubts whether the two cases are factually analogous. Underlying the court's decision in *Lonergan* was a belief that, where "the parties were each competent to contract, and there is no circumstance indicating the slightest unfairness in the transaction," 104 S.W. at 1065, "[t]here is no more reason why the

15. Plaintiff does not dispute that Texas law governs the interpretation of UAE's contract with Bethlehem. We agree. Texas has the most significant contacts with the matter in dispute. *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954).

16. Plaintiff asserts that the UAE-Bethlehem contract by its terms expressed a warranty and relies on one phrase extracted from a passage of the contract. That provision is unambiguous and, in context, contrasts tools and materials owned by Bethlehem and supplied by it to UAE for use at Beaumont pursuant to express contractual requirements (*e. g.,* sandblasting equipment, air compressors and a utility barge) with those tools and materials owned by Bethlehem and used by UAE without express contractual authority. As to this latter category, the provision negates warranties and disclaims liability. By implication, Bethlehem apparently warrants those tools and materials which it furnishes pursuant to the contract. However, UAE was obligated by the contract to furnish Steelmate. Bethlehem does not, therefore, by this language in the contract, expressly or impliedly warrant Steelmate.

[owner] should be held responsible for the alleged defects in the specifications that it did not discover for want of skill and knowledge of the business of an architect, than there is for holding [the contractor] to be bound by their acceptance of the defective plans which they understood as well as the [owner] did, and in all probability much better," *id.* In contrast, in the instant case, Bethlehem was allegedly more expert than UAE with respect to Steelmate. Plaintiff claims that, whereas Bethlehem had tested and caused others to test Steelmate and had used the product several times, UAE did not test Steelmate [17] and had used the product only once prior to the Beaumont job.

The *Lonergan* rule has not met with universal acceptance, *compare MacKnight Flintic Stone Co. v. New York,* 160 N.Y. 72, 54 N.E. 661 (1899), and a narrowing of its applicability conforms to the general trend in the law.[18] For example, Professor Corbin states:

> If the destruction of the partly completed structure or the defects in it when completed are caused by the representations of the owner on which the contractor reasonably relied, or by defects in plans and specifications supplied by the owner which the contractor was required to follow, the contractor will not be liable in damages for nonperformance and will not be denied judgment for compensation.

6 Corbin, *Contracts* § 1338 at 394 (1962). *See also* 18 Williston, *Contracts* § 1966 (3d ed. 1978).

It is not clear that even a Texas court would perfunctorily apply *Lonergan* where,

as alleged here, an owner is more experienced than the contractor with respect to the subject of the plans and specifications. Texas courts, while nominally subscribing to the *Lonergan* rule, apparently have not recently applied it to place on the contractor the risk of loss due to an owner's defective plans and specifications. *See Ruberoid Co. v. Scott,* 249 S.W.2d 256 (Tex. Ct. App. 1952); *City of Houston v. L. J. Fuller, Inc.,* 311 S.W.2d 285 (Tex. Ct. App. 1958); *Sands Motel v. Hargrave,* 358 S.W.2d 670 (Tex. Ct. App. 1962), *writ ref'd, n. r. e.* In fact, in *Newell v. Mosley,* 469 S.W.2d 481, 483 (Tex. Ct. App. 1971), *writ ref'd, n. r. e.,* a Texas court endorsed a rule which directly conflicts with that enunciated in *Lonergan*:

> "Subject to some exceptions, if a party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purpose in view, particularly if the party furnishing the plans is the owner, * * * "

Accordingly, we find that there are material issues of fact to be tried and the Bethlehem motion must be denied.

## CONCLUSION

MCP's and Bethlehem's motions for summary judgment are denied. SO ORDERED.

**17.** We are not persuaded that, by reason of paragraph 13 of the plans and specifications and similar provisions in the invitation to bid and the contract requiring the contractor to examine the plans and visit the site of the work, UAE agreed to assume the risk of *any* insufficiency in Bethlehem's plans and specifications. *See United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

**18.** "Earlier cases took the position that the builder by accepting the owner's plans promises to produce the result called for by the plans and accepts the risks attendant upon using the owner's specifications. It was believed that the owner relied upon the builder's

technical knowledge. The modern cases, however, generally hold that where plans and specifications are prepared by professionals hired by the owner, unless the language of the contract or the circumstances otherwise indicate, the owner warrants that the plans are adequate to produce the desired result unless the builder has reason to know of the inadequacy. As indicated in this statement of the rule the parties are free to allocate the risks by their agreement. Thus, if the builder expressly warrants that the owner's plans are adequate, he may not claim the excuse that they are inadequate." J. Calamari & J. Perillo, *Contracts* § 187 at 301–302 (1970) (footnotes omitted).